# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>September 28, 2021<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ____VM____ DEPUTY |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| The premises located at 3369 California St., Unit A, Huntington Park, California (the "SUBJECT PREMISES 1") as described more fully in Attachment A-1 | ) | |

Case No.  2:21-mj-04513-DUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of and possession with intent to distribute controlled substances |
| 21 U.S.C. § 846 | Conspiracy & attempt to distribute and PWID controlled substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Ellis Beamon*
_____
*Applicant's signature*

*Ellis Beamon, DEA Special Agent*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  September 28, 2021
_____

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Michael R. Wilner, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises to be searched is located at 3369 California Street, Unit A, Huntington Park, CA (the "SUBJECT PREMISES 1"). SUBJECT PREMISES 1 is located on a multi-family property surrounded by a small black fence.  At the front of 3369 California Street there is a white-colored single-family dwelling with orange-red bridge detail on the roof.  To the left of the white-colored single-family dwelling, there is a driveway that leads to a detached garage/second dwelling structure. There is a staircase on the left-hand side of the garage/second dwelling structure, at the top of which is the entrance to SUBJECT PREMISES 1.

3369 California Street, Huntington Park, CA (front view):



SUBJECT PREMISES 1 (front view):



SUBJECT PREMISES 1 (aerial view):



**ATTACHMENT B**

I. **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances) (the "Subject Offenses"), namely:

    a.    Any controlled substance, controlled substance analogue, or listed chemical;

    b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

    c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

    d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining

to, obtaining, possessing, using, applications for, or
transferring money over $1,000, such as bank account records,
cryptocurrency records and accounts;

    e.    Documents and records reflecting the identity of,
contact information for, communications with, or times, dates or
locations of meetings with co-conspirators, sources of supply of
controlled substances, or drug customers, including calendars,
address books, telephone or other contact lists, pay/owe
records, distribution or customer lists, correspondence,
receipts, records, and documents noting price, quantities,
and/or times when drugs were bought, sold, or otherwise
distributed, whether contained in hard copy correspondence,
notes, emails, text messages, photographs, videos (including
items stored on digital devices), or otherwise;

    f.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

    g.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

    h.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to

show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      i.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

      j.   Contents of any calendar or date book;

      k.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iii

as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.     In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

1.    During the execution of this search warrant, law enforcement is permitted to: (1) depress Giovanni SEPULVEDA's and Luis SANCHEZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Giovanni SEPULVEDA's and Luis SANCHEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Ellis Beamon, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for GIOVANNI SEPULVEDA ("SEPULVEDA") and LUIS SANCHEZ ("SANCHEZ") for a violation of 21 U.S.C. §§ 846, 841(a)(1): Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of applications for warrants to search:

a.   The premises located at 3369 California St., Unit A, Huntington Park, California (the "SUBJECT PREMISES 1") as described more fully in Attachment A-1;

b.   The premises located at 4741 Florence Ave., Unit B, Bell, California (the "SUBJECT PREMISES 2") as described more fully in Attachment A-2;

c.   A black 2015 Dodge Journey bearing California license plate number 7KHH316 (the "SUBJECT VEHICLE") as described more fully in Attachment A-3;

d.   The person of Giovanni SEPULVEDA ("SEPULVEDA"), as described further in Attachment A-4; and

e.   The person of Luis SANCHEZ ("SANCHEZ"), as described further in Attachment A-5.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) and 21 U.S.C. § 846

(conspiracy and attempt to distribute and possess with intent to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, A-5, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SPECIAL AGENT ELLIS BEAMON

5.   I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since January 2020.  I am currently assigned to DEA's Los Angeles Field Division, Enforcement Group 2, which investigates drug trafficking and money laundering violations under Titles 18 and 21 of the United States Code.  I have received 16 weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.

6.   Throughout my career as a federal agent, I have received numerous hours of training in drug investigations, investigative techniques, surveillance, and evidence collection.

I have also participated in drug investigations, including the
execution of search and arrest warrants involving drug
trafficking crimes.  These investigations have focused on drug
distribution, firearms violations, gang investigations, the
laundering of drug proceeds and monetary instruments derived
from narcotics activities, and conspiracies associated with drug
offenses.  I have debriefed defendants, informants, and
witnesses who have personal knowledge regarding drug trafficking
organizations.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On April 30, 2021, a DEA undercover agent and
confidential source ("CS")[1] conducted a controlled purchase of
approximately 300 suspected fentanyl pills from a seller whom
investigators later identified as SEPULVEDA.  DEA laboratory
testing confirmed that the suspected fentanyl pills consisted of
approximately 32.3 grams of a mixture or substance containing
fentanyl.  During this controlled purchase, SEPULVEDA drove the
SUBJECT VEHICLE to deliver narcotics to the CS.  After
conducting the transaction with the CS, SEPULVEDA drove the
SUBJECT VEHICLE to SUBJECT PREMISES 2, where an unknown male
individual entered the SUBJECT VEHICLE with SEPULVEDA, and

---

[1] The CS has been cooperating with the DEA since
approximately January 2021, following DEA's investigation into
the CS for drug trafficking.  The CS has a criminal history that
includes a prior conviction for drug trafficking and several
drug-related arrests.  During the period of the CS's
cooperation, the CS provided reliable information regarding
narcotics traffickers that DEA corroborated through independent
investigation.  The CS is working with the DEA for charging
consideration in the drug trafficking investigation.

shortly afterwards exited and reentered SUBJECT PREMISES 2. SEPULVEDA then departed and arrived at SUBJECT PREMISES 1.

8.   On July 15, 2021, the CS conducted a controlled purchase of approximately 600 suspected fentanyl pills from SEPULVEDA.  DEA laboratory testing results for this transaction are pending.  Again, SEPULVEDA used the SUBJECT VEHICLE to transport the narcotics to the CS.  Less than one hour after conducting the transaction with the CS, law enforcement saw SEPULVEDA visit SUBJECT PREMISES 2 and speak to an unknown individual at the door of the apartment, after which SEPULVEDA drove to SUBJECT PREMISES 1.

9.   On August 17, 2021, the CS conducted a controlled purchase of approximately two pounds of white crystalline substance suspected to be methamphetamine, which DEA laboratory testing later confirmed to consist of approximately 858 grams methamphetamine at 95 percent purity.  SEPULVEDA coordinated the controlled purchase, and instructed the CS to purchase the drugs from a relative of SEPULVEDA, who was later identified as SANCHEZ.  Before the transaction, DEA surveillance saw SANCHEZ depart SUBJECT PREMISES 2 with a cooler, and after the transaction with the CS, DEA surveillance saw SANCHEZ return to SUBJECT PREMISES 2.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   April 30, 2021 Purchase of Approximately 300 Fentanyl Pills

11.   Based on my conversations with the CS, I understand that on April 28, 2021, an acquaintance who the CS knew as "BLONDIE" told the CS that the CS could use a telephone number ending in -4474 (the "-4474 number") to purchase fentanyl pills.

12.   On April 28, 2021, I requested the subscriber information for the -4474 number.  The subscriber return showed that the cellular telephone number was issued by T-Mobile or its affiliates, and subscribed to "Cesar P Leather" at the address of SUBJECT PREMISES 1.[2]

13.   At my direction, on April 29, 2021, the CS called the -4474 number to inquire about purchasing drugs.  This call was recorded and took place in Spanish.[3]  During the phone call, the CS informed the unknown Spanish-speaking male (later identified as SEPULVEDA) that he/she had friends coming into town and needed "it" (meaning fentanyl pills).  The male confirmed that he could provide 400 of what the CS believed to be fentanyl

---

[2] On July 29, 2021, I obtained a warrant for location information from the -4474 number from the Honorable Alicia G. Rosenberg in Case No. 2:21-mj-03515.  On September 10, 2021, I obtained a second warrant for location information from the -4474 number from the Honorable Jacqueline Chooljian in Case No. 2:21-mj-04223.  The location returns from these warrants confirm that the user of the -4474 number resides near SUBJECT PREMISES 1, although the location information is not precise enough to identify the user's specific address.

[3] Unless otherwise noted, all text messages and calls discussed herein were recorded and took place in Spanish.  The calls and text messages have been translated to me by Spanish-speaking officers and agents.  The following summaries of calls and text messages are not verbatim unless otherwise indicated.

pills for $1,200, and told the CS to keep him posted on when it was needed.

14.   Later, on April 29, 2021, at my direction, the CS sent a text message to the -4474 number, to ask if it was ok to meet the following day in the afternoon.  The CS received a text back stating it was ok and that he "is ready."  Based on my training, experience, and knowledge of this investigation, I believe that this meant that the contact for the -4474 number had the pills and was ready to conduct the transaction.

15.   On April 30, 2021, at my direction, the CS sent a text message to the -4474 number asking to meet at 2:00 p.m.  The CS received a response back stating "that's fine," and the two agreed to meet in South Gate, California.  While discussing the meeting location, the seller stated that he lived at an address on California Street, Huntington Park, California, approximately one block from SUBJECT PREMISES 1, and proposed meeting there instead of South Gate.  Based on my training and experience, I understand that drug sellers may seek to obscure their true address from drug purchasers for safety and security reasons.

16.   At approximately 1:00 p.m. on April 30, 2021, I instructed the CS to text the -4474 number to confirm the location and time to buy fentanyl pills.  The CS did so, and the seller confirmed the meeting location would be at a shopping center parking lot in South Gate, California.

17.   Based on my own presence during the deal and follow-up surveillance and conversations with the CS and other agents who were present and my review of audio and video surveillance of

the deal, I understand the following series of events occurred on April 30, 2021:

a.   Because of the subscriber information associating the -4474 number with SUBJECT PREMISES 1, DEA Special Agent Christopher Sinclair and Group Supervisor Sean Fromson arrived at the street outside of SUBJECT PREMISES 1 before the agreed meeting.   The agents saw the SUBJECT VEHICLE parked in the driveway of SUBJECT PREMISES 1.   According to DMV records, from March 8, 2019 to March 8, 2020, the SUBJECT VEHICLE was registered to Cesar Sepulveda,[4] with a registered address at SUBJECT PREMISES 1.   The SUBJECT VEHICLE is currently not registered.

b.   Before the planned drug transaction, the agents left the area of SUBJECT PREMISES 1 and arrived at the meet location for surveillance.

c.   Law enforcement officers present at the meet location then saw the SUBJECT VEHICLE arrive at the meet location and park next to the car of the DEA Special Agent Thomas Coughlin, who was acting in an undercover capacity with the CS.   The CS was searched before the transaction and had no controlled substances in his or her possession.

d.   After the SUBJECT VEHICLE arrived, the CS exited the undercover agent's car, approached the passenger side of the SUBJECT VEHICLE, and entered the front passenger seat of the SUBJECT VEHICLE.   Inside the SUBJECT VEHICLE, the CS spoke

---

[4] From reviewing public records, I believe that Cesar Sepulveda may be an older male relative of SEPULVEDA, such as SEPULVEDA's father.

briefly to the driver of the SUBJECT VEHICLE, later identified by the CS and the undercover agent as SEPULVEDA, as set forth below, and exchanged $1,200 with SEPULVEDA for approximately 300 suspected fentanyl pills.[5]  During the transaction, the CS and the undercover agent reported seeing a woman and small child in the backseat of the SUBJECT VEHICLE.

      e.   The CS later informed me that s/he recognized SEPULVEDA's voice while in the car together as the same voice the CS had been communicating with using the -4474 number.

      f.   Following the purchase, at approximately 2:35 p.m., DEA surveillance teams followed SEPULVEDA and the SUBJECT VEHICLE from the location of the controlled purchase directly to SUBJECT PREMISES 2.  There, surveillance saw SEPULVEDA meet with an unidentified male who exited from SUBJECT PREMISES 2 and entered the SUBJECT VEHICLE's front passenger seat.  Following the brief meeting, DEA Special Agent Ethan Suntrup observed the unidentified male return to SUBJECT PREMISES 2 and SEPULVEDA depart the area in the SUBJECT VEHICLE.

      g.   After leaving the area of SUBJECT PREMISES 2, SEPULVEDA returned to the area nearby SUBJECT PREMISES 1, where SEPULVEDA exited the SUBJECT VEHICLE and walked with the unknown female and small baby down the driveway to the rear of the property where SUBJECT PREMISES 1 is located.

18.  I believe that SEPULVEDA was the person communicating with the CS in advance of the drug transaction using the -4474

---

[5] SEPULVEDA told the CS that he could only sell the CS 300 pills, not 400 pills.

number because (1) SEPULVEDA met with the CS and provided the CS
with the pills that were negotiated using the -4474 number,
(2) SEPULVEDA drove the SUBJECT VEHICLE to the deal, which
before the deal was observed by DEA agents in the driveway of
SUBJECT PREMISES 1, the subscriber address for the -4474 number,
and (3) when meeting in person with SEPULVEDA, the CS recognized
SEPULVEDA's voice as the same voice the CS had been
communicating with in advance of the deal using the -4474
number.

19.  On April 30, 2021, DEA agents conducted a presumptive
test on the suspected fentanyl pills, which returned for
acetaminophen.  I know, based on my training and experience,
that acetaminophen pills are often used as a starting point to
create fentanyl pills and that acetaminophen is therefore often
found in test results for substances that contain fentanyl.  On
May 28, 2021, I received an official lab report from DEA
Southwest Laboratory confirming the suspected pills consisted of
approximately 32.3 grams of a mixture or substance containing
fentanyl.

20.  On April 30, 2021, after the controlled purchase,
SEPULVEDA sent the CS a text message using the -4474 number
stating that if the CS needed more, to let him know.

21.  On May 11, 2021, at my direction, the CS sent a text
message to the -4474 number inquiring if SEPULVEDA had any
(referring to additional fentanyl pills).  SEPULVEDA stated that
he did and asked how many the CS needed.  The CS replied and
stated that he/she would let him know.  SEPULVEDA confirmed and

stated to let him know how many.  Based on my review of the text
conversation, I understand that the CS confirmed with SEPULVEDA
that SEPULVEDA was willing to conduct another drug transaction
and the SEPULVEDA advised the CS that he was willing to sell
more pills if the CS wanted.

**B.    Identification of GIOVANNI SEPULVEDA as the Seller of the Fentanyl Pills**

22.  On July 7, 2021, at my direction, Torrance Police
Department detectives searched a traffic stop police database
for information about the SUBJECT VEHICLE.  Specifically, I
understand from speaking to the Torrance Police Department
detectives that this database can be used to identify drivers of
vehicles stopped by police in traffic and other law enforcement
stops.  The search results indicated that SEPULVEDA had
previously been stopped while driving the SUBJECT VEHICLE.  I
then obtained a California DMV photograph of SEPULVEDA and
presented the photo to the undercover DEA agent present during
the April 30, 2021 drug deal.  The undercover agent confirmed
that SEPULVEDA was the driver of the SUBJECT VEHICLE before the
CS entered the car and acquired the fentanyl pills.

23.  I also presented SEPULVEDA's photograph to the CS, who
was in the SUBJECT VEHICLE interacting with the person who sold
the CS the drugs that day.  The CS also confirmed that SEPULVEDA
sold him/her the fentanyl pills inside SUBJECT VEHICLE.

**C.    July 15, 2021 Purchase of 600 Suspected Fentanyl Pills**

24.  On July 14, 2021, at my direction, the CS sent a text
message to SEPULVEDA at the -4474 number inquiring if he had any

more "azules," or blues, which I understand from my training and experience refers to fentanyl pills, which are often blue in color.  SEPULVEDA responded affirmatively, and asked how many the CS wanted.  The CS stated 600, and asked how much that would be.  SEPULVEDA responded via text message that it would be $3.50 each.  During this exchange, SEPULVEDA inquired if the CS would buy that day.  The CS stated that he/she would buy the next morning before 12:00 p.m.

25.   On July 15, 2021, at approximately 12:30 p.m., I advised the CS to contact SEPULVEDA via the -4474 number to confirm the purchase of approximately 600 fentanyl pills for $2,100.00.  As I understand from reviewing the text messages, the CS inquired if SEPULVEDA could meet in about one hour. SEPULVEDA responded with a confirmation and asked the CS if it was ok to meet in Huntington Park, California.  The CS confirmed that he/she could meet in Huntington Park at the Home Depot and asked how long it would take SEPULVEDA to reach the location. SEPULVEDA replied that he would be at the location in ten minutes.

26.   Based on my own presence during the deal and follow-up surveillance and conversations with the CS and other law enforcement officers and agents who were present and my review of audio and video surveillance of the deal, I understand the following series of events occurred on July 15, 2021:

a.   SEPULVEDA arrived at the pre-arranged location at approximately the scheduled time in the SUBJECT VEHICLE.  The CS was already present in a vehicle that he/she was driving.

b.    After SEPULVEDA arrived, the CS exited the CS's car and approached the SUBJECT VEHICLE.  The CS stood outside the SUBJECT VEHICLE and spoke briefly to SEPULVEDA while he sat in the driver's seat of the SUBJECT VEHICLE, and then the CS handed SEPULVEDA $2,100 in exchange for approximately 600 suspected fentanyl pills.

c.    Following the purchase at approximately 2:00 p.m., surveillance teams followed the SUBJECT VEHICLE from the location of the transaction and saw the SUBJECT VEHICLE make a number of stops.  Specifically:

i.    At approximately 2:04 p.m., Torrance Police Department Detective Tanaka saw the SUBJECT VEHICLE park along the north curb line of 57th Street, just west of Seville Avenue, and saw SEPULVEDA looking around and monitoring traffic.  At approximately 2:07 p.m., Torrance Police Department Detective Masone saw an unknown Hispanic man enter the passenger side of the SUBJECT VEHICLE.  Detective Masone then saw the SUBJECT VEHICLE drive to a liquor store, where the unknown passenger left the SUBJECT VEHICLE, entered the liquor store, and then returned to the SUBJECT VEHICLE.

ii.    At approximately 2:14 p.m., Detective Tanaka saw the SUBJECT VEHICLE drive away from the liquor store and park along the 2600 block of East 57th Street in Huntington Park, California.  Law enforcement officers saw SEPULVEDA and the unknown Hispanic man leave the SUBJECT VEHICLE and sit on the porch of a nearby house.  At approximately 2:21 p.m., Torrance Police Department Sergeant Vasquez saw SEPULVEDA talk

12

on his cell phone.  At approximately 2:38 p.m., Sergeant Vazquez observed SEPULVEDA leave the residence in the SUBJECT VEHICLE.

iii. At approximately 2:55 p.m., about one hour after the drug transaction, Detective Tanaka saw the SUBJECT VEHICLE drive into the alleyway just north of SUBJECT PREMISES 2, and park in the parking lot.  Detective Tanaka saw SEPULVEDA talking on his cell phone inside the car.  At approximately 2:59 p.m., SEPULVEDA exited the SUBJECT VEHICLE, walked up a set of stairs to the SUBJECT PREMISES 2, and knocked on the door of SUBJECT PREMISES 2.  Detective Tanaka saw SEPULVEDA speaking to an unknown individual briefly before returning to the SUBJECT VEHICLE.

iv.  At approximately 3:00 p.m., Detective Tanaka saw the SUBJECT VEHICLE depart the parking lot and turn westbound onto Florence Ave.  At approximately 3:11 p.m., Detective Tanaka saw the SUBJECT VEHICLE stop in the middle of Pacific Blvd., where an unknown Hispanic male in a grey shirt approached the passenger side of the SUBJECT VEHICLE and talked with SEPULVEDA.

v.  At approximately 3:16 p.m., Detective Masone then saw SEPULVEDA drive the SUBJECT VEHICLE to the area of SUBJECT PREMISES 1 and remain in the SUBJECT VEHICLE.

vi.  At approximately 4:20 p.m., Detective Tanaka saw SEPULVEDA drive the SUBJECT VEHICLE to a shopping center parking lot at Live Oak St. and State St.; at approximately 4:25 p.m., Torrance Police Department Detective Kamischke saw the SUBJECT VEHICLE leave the parking lot.  Sergeant Vasquez then

saw the SUBJECT VEHICLE turn back into the driveway leading to the SUBJECT PREMISES 1.

    vii. At approximately 4:50 p.m., the SUBJECT VEHICLE departed the area of SUBJECT PREMISES 1 being driven by an unknown Hispanic female with SEPULVEDA in the passenger seat. The unknown Hispanic female and SEPULVEDA traveled to various stores before returning to SUBJECT PREMISES 1.

27. On July 15, 2021, DEA agents conducted a presumptive test on the suspected fentanyl pills, which again returned for acetaminophen.  Formal testing results are pending.

  **D. August 17, 2021 Purchase of Approximately Two Pounds of Methamphetamine from SEPULVEDA's Associate.**

28. On August 12, 2021, at my direction, the CS sent a text message to SEPULVEDA at the -4474 number inquiring if SEPULVEDA had any "frosts," which I understand to be a code word for methamphetamine.  SEPULVEDA responded via text message stating that he did have "frost," and asking how many the CS would need.  The CS responded by stating that he/she will need 2 (meaning 2 pounds).  SEPULVEDA responded that it would be $1,100 per pound and for the CS to let him know when the CS needed to purchase.

29. On August 16, 2021, at my direction, the CS sent a text message to SEPULVEDA at the -4474 number inquiring if SEPULVEDA would be able to conduct a transaction the next day, on August 17, 2021.  SEPULVEDA responded to the CS stating that he was currently in Las Vegas and would return on Thursday, but that he would see if he could send his cousin on his behalf to

meet the CS.  SEPULVEDA then responded and stated that his
cousin could meet the CS on August 17, 2021.

30.  On August 17, 2021, SEPULVEDA sent a text message from
the -4474 number to the CS stating that his cousin could meet in
the Bell Gardens/Florence area, whenever the CS was ready.
SEPULVEDA then provided an address one house away from SUBJECT
PREMISES 2.  The CS and SEPULVEDA ultimately arranged for the CS
to meet SEPULVEDA's cousin at approximately 2:30 p.m. in the
parking lot of a chain sandwich restaurant on Firestone Blvd.,
in South Gate, California.  SEPULVEDA stated that his cousin
would arrive in a blue Honda.

31.  Based on my own presence during the deal and follow-up
surveillance and conversations with the CS other agents who were
present and my review of audio and video surveillance of the
deal, I understand the following series of events occurred on
August 17, 2021:

a.  After the previous two controlled purchases with
the CS, SEPULVEDA drove to SUBJECT PREMISES 2 for a brief period
of time before returning to SUBJECT PREMISES 1.  Thus, prior to
the third controlled purchase, at approximately 2:20 p.m., a
surveillance team was set up at the address of SUBJECT PREMISES
2.  Outside SUBJECT PREMISES 2, the agents saw a blue Honda
parked in the building's parking lot.  DEA Group Supervisor
Jeffrey LaRock then saw a male wearing a blue cap and glasses
exit SUBJECT PREMISES 2 with a dark colored lunch cooler, enter
the blue Honda, and depart before the controlled purchase.  The

surveilling agents did not see the blue Honda's license plate or see whether there were any other passengers in the vehicle.

b.   At approximately 2:35 p.m., at the designated location for the drug transaction, a person wearing a similar-appearing blue cap arrived in a blue Honda, bearing California license plate #8HST375, which was registered to LUIS SANCHEZ and Antonio Sanchez Jr.  DEA agents were able to positively identify LUIS SANCHEZ as the driver of the blue Honda based on the Department of Motor Vehicle photographs of LUIS SANCHEZ and Antonio Sanchez Jr.  The CS also later identified LUIS SANCHEZ as the person in the blue cap that he/she met with on August 17, 2021.

c.   The CS was again searched for controlled substances before meeting with SANCHEZ with negative results. The CS entered SANCHEZ's car.  Once inside SANCHEZ's blue Honda, the CS purchased approximately two pounds of a white crystalline substance suspected to be methamphetamine for $2,200 from SANCHEZ.  After the transaction, SANCHEZ told the CS that if he/she ever needed drugs transported to Bakersfield, California, he could do that for him/her.  During this controlled purchase, an unidentified female was in the rear passenger seat of the blue Honda.

d.   Following the controlled purchase, surveillance teams followed the blue Honda from the meet location.  At approximately 2:43 p.m., DEA agents saw the blue Honda return to SUBJECT PREMISES 2.  At approximately 2:46 p.m., DEA Group Supervisor Jeffrey LaRock saw SANCHEZ exit the blue Honda and

enter a liquor store located at the same address as SUBJECT
PREMISES 2.  SANCHEZ exited the liquor store a few minutes
later, walked towards the passenger side of the blue Honda, and
handed the passenger an unknown item.  SANCHEZ then walk toward
SUBJECT PREMISES 2 empty handed, removed a key from his lanyard,
unlocked the front door, and entered.

32.  On August 17, 2021, DEA agents conducted a presumptive
test on the white crystalline substance suspected to be
methamphetamine, which returned with a positive identification
of the substance as methamphetamine.

33.  On August 26, 2021, I received an official lab report
from DEA Southwest Laboratory confirming the suspected white
crystalline substance consisted of approximately 858 grams of
methamphetamine at 95 percent purity.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

34.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their

vehicles in the event of an unexpected opportunity to sell narcotics arises.

       f.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

       g.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

       h.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

19

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[6]

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

36.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

e.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant, and be in the possession of SEPULVEDA or SANCHEZ, or in SEPULVEDA or SANCHEZ's belongings: (1) depress SEPULVEDA's and SANCHEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SEPULVEDA's and SANCHEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

38.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

39.   For all of the reasons described above, there is probable cause to believe that SEPULVEDA and SANCHEZ have committed violations of 21 U.S.C. §§ 846, 841(a)(1): Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES 1, SUBJECT PREMISES 2, and the SUBJECT VEHICLE described in Attachments A-1, A-2, and A-3, respectively.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __28__ day of
September, 2021.

_____
THE HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE